LEBOEUF, LAMB, GREENE & MACRAE LLP
125 West 55th Street
New York, NY 10019
Telephone: (212) 424-8000
Facsimile: (212) 424-8500
Peter A. Ivanick (PI-1702)
Allison H. Weiss (AW-1070)

LEBOEUF, LAMB, GREENE & MACRAE LLP
Two Prudential Plaza
180 North Stetson Ave., Suite 3700
Chicago, Illinois 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100
Lewis S. Rosenbloom (LR-1913)
David D. Cleary (DC-9166)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RITCHIE RISK-LINKED STRATEGIES | ) | Chapter 11 |
| TRADING (IRELAND), LTD., | ) | |
| | ) | Case No.: 07_____ (   ) |
| Debtor. | ) | |
| In re: | ) | |
| | ) | |
| RITCHIE RISK-LINKED STRATEGIES | ) | Chapter 11 |
| TRADING (IRELAND) II, LTD., | ) | |
| | ) | Case No.: 07_____(   ) |
| Debtor. | ) | |

**AFFIDAVIT OF FRED C. CARUSO**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF NEW YORK | ) |

Fred C. Caruso, being duly sworn, deposes and states:

      1.     I am the Chief Restructuring Officer of Ritchie Risk-Linked Strategies Trading

(Ireland), Ltd. ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.

("Ritchie II"), each a corporation organized under the laws of Ireland and the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, books and records.

2. On June 20, 2007, (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as amended by the Bankruptcy Abuse and Consumer Protection Act of 2005 (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. To enable the Debtors to minimize the adverse effects of the commencement of these cases on their businesses, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion" or "Motion"). The First Day Motions seek relief intended to allow the Debtors to: (a) retain the professionals needed to guide them through their chapter 11 cases; and (b) perform and meet those obligations necessary to fulfill their duties as debtors in possession in these cases. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

4. I submit this Affidavit in support of the First Day Motions pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"). Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances,

information learned from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' professionals. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

### I.     Business of the Debtors

#### A.     *General Information*

5.      Ritchie I was incorporated and registered in Ireland on June 14, 2005 as a private limited company. Ritchie II was incorporated and registered in Ireland on November 22, 2005 as a private limited company. The Debtors' registered offices are located at 4th Floor, 25-28 Adelaide Road, Dublin 2, Ireland (telephone number +353 1 6199000). As of the Petition Date, the Debtors did not maintain an office in the United States.

6.      The Debtors were formed as special purpose vehicles to invest in life insurance policies (the "Policies") in the life settlement market. The Debtors' acquisition of the Policies, and their contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies in anticipation of a securitization transaction.

7.      The Policies were issued by leading insurance companies upon individuals who are generally wealthy and at least 65 years of age (the "Insureds"). The Insureds desired to sell their Policies and the related benefits rather than surrender them to the issuing insurance company for less value. The Policies were purchased by Coventry First, LLC ("Coventry") and / or LST I, LLC ("LST") from the Insureds. The Debtors purchased the Policies from LST at prices expected to yield a profit to the Debtors' investors upon the earlier of payment of the

death benefit to the Debtors or the securitization of the Policies. As a condition to the sale of the Policies, LST required each of the Debtors to retain Coventry for a fee to service the Policies and Montgomery Limited ("Montgomery") to provide advice on the management and trading of the Debtors' assets. LST, Coventry and Montgomery are affiliates. LST, however, sold non-conforming Policies to the Debtors. As a consequence, the Debtors' ability to market the Policies for sale at acceptable values has deteriorated and the quality of title has been questioned. Thus, the value of significant assets of the Debtors, the Policies and the proceeds thereof, has declined precipitously. That decline in value also has affected the Debtors' ability to execute a planned securitization transaction and impaired the ability of the Debtors to pay their obligations with regard to the Policies, thereby impacting further the marketability of the Debtors' assets through ordinary sale processes and requiring the Debtors to seek relief under the Bankruptcy Code in order to preserve the value of the assets for their creditors.

**B.**     ***Life Insurance Settlement Policy Transactions***

8.     Life insurance settlement policy transactions represent a secondary market within the life insurance sector that involves acquiring life insurance policies from individual insureds. Life insurance now carries a dynamic market value that can be independently appraised just like stocks, bonds and real estate. As a result, consumers that no longer require the death benefit under a life insurance policy can now realize significantly more than cash surrender value for unneeded or underperforming policies.

9.     In a life insurance settlement policy transaction, a life insurance contract is purchased by an investor at a discount to the ultimate death benefit to be paid upon the death of the insured, but at a higher price than the corresponding surrender value of the policy (the price the original life insurance company would pay the insured to terminate coverage). The investor may, in turn, aggregate the life insurance settlement policies for financing purposes or for further

sale to third-parties. Upon purchasing a policy, the investor maintains such policy, by paying the premiums and any related costs (collectively, the "Premiums") until the insured individual dies. When the insured dies, the investor, as the owner of the policy, is entitled to the death benefit proceeds.

10.     The Policies that are significant assets of the Debtors in these cases typically insure wealthy individuals 65 years of age and older, who have determined that they prefer an immediate, lump-sum payment to the ongoing expense of premium payments. In a typical situation, a policy owner's heirs are financially independent or the policy was purchased by a corporation on the life of an executive for which corporation the insured no longer works.

**C.**     ***Formation of the Debtors as Special Purpose Vehicles***

11.     The Debtors were established by representatives of Ritchie Capital Management, L.L.C. ("Ritchie Capital") and Ritchie I Risk-Linked Strategies Trading, Ltd. ("Ritchie I Risk-Linked"). Ritchie I Risk-Linked is the financial beneficiary of the principal investors in the Debtors, Ritchie Risk-Linked Life Strategies Trust I ("Ritchie Trust I") and Ritchie Life Strategies Master Trust ("Ritchie Master Trust"). Third-private private investors hold an approximate 30% financial interest in Ritchie Risk-Linked and the affiliates of Ritchie Capital are the financial beneficiaries of the remaining interest.

12.     The following diagram depicts the corporate relationships among the major investors in Ritchie I and Ritchie II:



# RITCHIE II



13.     Beginning in 2005, Ritchie Capital began negotiating with Coventry an arrangement under which Ritchie Capital would do business with Coventry for the purpose of investing in life insurance policies for the purpose of re-selling them at a future point through a securitization transaction.  Coventry, its senior management and owners represented themselves to be of high character and to employ the highest ethical practices with regard to its participation in the life settlement industry.

14.     Coventry is a leading player in the secondary market for life insurance policies. Coventry entered that market as a buyer in 2001 or 2002, purchasing 436 policies representing $720 million in total death benefits in 2002.  By 2005, Coventry had purchased 1,318 life insurance policies representing more than $3 billion in death benefits.  Coventry sells the policies that it purchases to institutional investors.  Upon information and belief, such investors have included the American International Group, Citigroup and Berkshire Hathaway.

15.     Ritchie Capital and Coventry structured a transaction in which the Debtors purchased policies from LST, a Coventry affiliate, based on specific representations, warranties and covenants from LST relating to purchase practices and ownership interests, sell them to the Debtors.  Ritchie Capital (specifically, by Ritchie Trust I and Ritchie I Master Trust, whose sole beneficiary is Ritchie I Risk-Linked) and Coventry (to a lesser extent) committed capital to Ritchie I and Ritchie II in order to provide the Debtors with part of the funding needed to acquire the Policies.  Coventry would continue to manage the daily administration of the Polices in its role as "Servicer" of the Polices.

16.     Rounds of capital commitment negotiations were concluded in June 2005, September 2005, December 2005 and June 2006.  Each round culminated in the commitment by Ritchie Capital and Coventry of additional capital to the Debtors.

17.     Ritchie Capital's representatives contributed the great majority of the financing to the formation of the Debtors. Coventry's specialty was in analyzing and servicing life insurance policies. Additionally, it was Coventry's responsibility to seek out and purchase individual policies that met certain pre-defined criteria that the parties had agreed on.  Coventry obtained life insurance policies from policy owners and thereafter occupied a position of superior knowledge with respect to the purchase and servicing of life insurance policies.  Coventry's work force includes persons with deep experience in the life insurance industry.  Coventry specializes in understanding life insurance policies.  Coventry's expertise includes, among other things, the actuarial and financial knowledge required to optimize the profitability of a life insurance policy by minimizing premium payments.

18.     Following the purchase of the Policies by Coventry/LST, and as a condition to the sale of the Policies required the Debtors to retain (i) Coventry as the "Servicer" of the Policies pursuant to certain Servicing and Monitoring Agreements and (ii) Montgomery pursuant to certain Investment and Administration Agreements to provide advice on the management and trading of the Debtors' assets.  Specifically, Coventry agreed to (i) monitor the health status of each insured and maintain current information about such insured and the related Life Settlement Policy; (ii) contact each Insurer at least annually to ensure the accuracy of the information in its possession; (iii) inform the Debtors of any determination by Coventry that a claim for payment of any death benefit or portion thereof under a Life Settlement Policy may be made; and (iv) inform the Debtors as to when premium payments or interest payments are due with respect to the Insurers and shall coordinate the payment of such amounts.  Montgomery obligated itself, among other things, to consult with, give advice to and make recommendations to the Debtors

concerning the identity of potential purchasers of the Debtors' assets, the value and marketability of those assets and the issuance of related debtor obligations secured by those assets.

19.     Following their formation and acquisition of the Policies, the Debtors began to prepare for a securitization transaction in which Ritchie I would sell the policies to a newly formed special purpose vehicle. The new vehicle would raise funds for the purchase price by issuing securities backed by the Policies. The Debtors' investors contemplated that either the net death benefit under the Policies would be paid to the Debtors or the securitization proceeds would be distributed in accordance with a predetermined priority of payments agreed to by the significant creditors and the holders of the securities of the respective Debtors.

20.     For purposes of completing the securitization transaction, representatives of the Debtors, with the support and encouragement of Coventry, had obtained a pre-sale report and a rating from the Moody's service on a number of the Policies. The Debtors, however, were unable to proceed with the securitization transaction, because Moody's withdrew that rating in October, 2006, based upon the action filed by the New York State Attorney General against Coventry and other defendants alleging that they engaged in, among other things, fraudulent business practices with regard to its participation in the life insurance settlement policy industry.

**II.     Events Leading To Chapter 11**

**A.     *The Attorney General Complaint***

21.     On October 26, 2006, the Attorney General for the State of New York filed a Complaint against Coventry, Montgomery Capital, Inc., The Coventry Group, Inc. and Reid S. Buerger, alleging that Coventry, as an active purchaser of life insurance settlement policies, engaged in various improper practices in its acquisition of policies from insured. See Complaint, New York Attorney General v. Coventry First, LLC, et al., No. 404620-06 (October 26, 2006,

N.Y. Sup. Ct.). The Debtors purchased the Policies from an affiliate of Coventry prior to the filing of the Complaint. The Debtors were not named as a party to the Complaint, but "Ritchie Capital" is identified as an additional participant in the life insurance settlement policy business.

22. The Complaint alleges claims against Coventry, certain of its principals and certain affiliates for fraudulent business practices, anti-competitive behavior, securities violations, common law fraud, unjust enrichment and breach of fiduciary duty. The Complaint seeks, among other things, rescission of the sale transactions by the insured individuals to Coventry.

23. As a result of the Complaint, the Debtors were unable to complete the planned securitization transaction, the Debtors' financial status and ability to obtain additional funding deteriorated significantly, and the Debtors were forced to initiate efforts to restructure their obligations and to sell the Policies.

24. In response to the filing of the Complaint by the NY Attorney General, the downgrade of its assets and its inability to complete a securitization transaction, representatives of the Debtors engaged Development Specialists, Inc. ("DSI") to assist with efforts to refinance the Debtors' operations or otherwise restructure their obligations. Thereafter, Ritchie I entered into an amendment to its senior lending facility with ABN AMRO Bank N.V. ("ABN") providing for an increase in the Liquidity Facility to fund its monthly operational expenses, including payment of the Premiums and other amounts due under the Policies, through May, 2007.

25. Maintaining the Policies requires the expenditure of significant capital to pay the Premiums, pay other amounts owing to the insurance companies (such as payment of interest on advances taken against the Policies) and related costs of operation. Moreover, the market value

of the Policies has greatly diminished since the New York Attorney General's action was commenced. For these and other reasons, the Debtors were not able to successfully market the Policies for sale or to obtain funding necessary to maintain the Policies until their natural maturation (the death of the Insureds).

26. Accordingly, the Debtors elected to pursue their remedies against the parties responsible for their financial distress by initiation of suit for recovery of damages.

**B.** ***The Ritchie I Complaint***

27. On May 2, 2007, a complaint was filed in the U.S. District Court for the Southern District of New York alleging that the Debtors and their investors were defrauded by certain companies and individuals affiliated with the Coventry-affiliated group of companies that participated in the formation, structure and financing of the Debtors as special purpose vehicles. See Complaint, Ritchie Capital Management, L.L.C., et al. v. Coventry First, LLC, et al., No. 07-3494 (May 2, 2007, U.S. D.Ct. S.D. N.Y.), (the "Ritchie I Complaint"). The Debtors are plaintiffs to the Ritchie I Complaint, together with Ritchie Capital, Ritchie Risk-Linked, Ritchie Master Trust and Ritchie Trust I, which are principal beneficiaries and investors in the Debtors (collectively, the "Ritchie I Plaintiffs").

28. The defendants to the Ritchie I Complaint are related to Coventry. Coventry owns LST, which was the Seller of the Policies to the Debtor. LST is owned by Montgomery Capital, Inc. and affiliated with The Coventry Group, Inc. Coventry is owned and controlled by the Buerger family, which includes Alan Buerger, Constance Buerger, and Reid S. Buerger. Coventry, its affiliates and subsidiaries and the Buerger family are referred to collectively as the "Coventry Defendants." Sandy Run, Ltd., a minority investor in each of the Debtors via the purchase of Subordinated Securities, is controlled by the Coventry Defendants.

29.     The Ritchie I Complaint alleges that Coventry partnered with the Ritchie I Plaintiffs to invest in life insurance policies with a view toward re-selling them through a securitization transaction.  The Ritchie I Complaint alleges that Coventry concealed from Ritchie Capital that the Coventry Defendants were systematically defrauding the owners of the policies, and then further deceived Ritchie Capital as to the existence of an investigation by the Attorney General of New York into the Coventry Defendants' misconduct.

30.     Specifically, the Ritchie I Complaint alleges that Moody's lost confidence in the health of the collateral – *i.e.*, the Policies – because it no longer believed that representations and warranties could be made by Ritchie I and Ritchie II to potential investors in the securitization of the nature and character provided to, and relied upon by, Ritchie I and Ritchie II in the purchase of the Policies.  The Ritchie I Complaint further alleges that Moody's no longer believed that the Policies had been purchased in compliance with applicable legal requirements.

31.     Based on the initial indications from potential buyers and in order to preserve and enhance the value of the Policies for their creditors, the Debtors determined that protection under chapter 11 of the Bankruptcy Code was required.  The Debtors commenced these cases to prepare the Policies for sale and to distribute their assets pursuant to a chapter 11 plan of reorganization.

## C.     *The Debtors' Efforts to Maintain the Value of the Policies*

32.     The Debtors continue to seek potential purchasers of their assets but as yet have not identified a prospective purchaser for the Policies.  As the Debtors prepared to commence comprehensive negotiations and due diligence with selected parties, the Debtors identified the information necessary for potential bidders upon the Debtors' assets to be sufficiently informed regarding the Policies to submit bids and yield full value to the Debtors.  The Debtors retained

professional advisors to assist in the process and continue their efforts to collect the information needed for a successful sale process.

33.     In order for Ritchie I to continue operating its business in the ordinary course and to preserve estate assets, it is essential that it obtain immediate postpetition financing and authority to use cash collateral. Ritchie I's survival as a going concern is dependent upon immediate liquidity to ensure that the Debtors are able to make pending premium and servicing payments in relation to the Policies. Failure to obtain liquidity will erode the value of Ritchie I's assets, impair the operation of its business, and harm the marketing efforts currently underway to sell all or substantially all of the Debtors' assets.

34.     Contemporaneously with their petitions for relief in these cases, the Debtors have filed a motion requesting authority for Ritchie I to incur postpetition senior secured financing (the "DIP Financing") in the amount of up to $30,000,000 and to use cash collateral of the Prepetition Senior Lender. The proceeds from the DIP Financing and the cash collateral will be used to make premium payments, pay Life Settlement Policies' servicing fees and pay other operating expenses, including any payments required under the DIP Financing documents. Subject to a Carve-Out of the Coventry Litigation (as each of those capitalized terms are defined in the DIP Financing Motion), the DIP Financing will be secured by a first priority, senior priming perfected lien in and to the DIP Collateral (as defined in the DIP Credit Agreement attached to the DIP Financing Motion), including the Prepetition Collateral (as defined in the form of DIP Credit Agreement attached to the form of Interim Order) of the Prepetition Senior Lender securing obligations under the Prepetition Loan Agreement. In connection with the approval of the use of cash collateral and the DIP Financing, the Debtors are also seeking authorization to grant adequate protection to the Prepetition Senior Lender in respect of

its interests in Prepetition Collateral. As adequate protection to the Prepetition Senior Lender for any diminution in the value of its interests in the Prepetition Collateral, the Prepetition Senior Lender shall be granted replacement liens on, and security interests in, the DIP Collateral, to secure them against any diminution in the value of the Prepetition Collateral.

35. Without immediate access to postpetition financing and authority to use the cash collateral, the Debtors will suffer substantial and irreparable harm, which will threaten their ability to reorganize successfully. Ritchie I's need for access to the DIP Financing and use of the cash collateral, therefore, is urgent.

**D.**     ***History of the Debtors' Prepetition Operations***

36. The Debtors' primary business activities have consisted of entering into the Transaction Documents (as defined herein), the purchase of approximately 1,100 life insurance settlement policies and all other activities related to the operation of the Debtors as special purpose vehicles to hold the Polices and engage in the securitization of the Policies. The Debtors do not conduct any other significant business activities. Based upon these limited business objectives, the Debtors have comprehensive agreements with third parties for the provision of management, administrative and operational services.

Administrative, Management and Supervisory Bodies

37. The Debtors appointed Marsh Management Services (Dublin) Limited, a company incorporated under the laws of Ireland ("Marsh Management"), as Corporate Administrator to provide corporate administrative, accounting and related services pursuant to Corporate Services Agreements. Marsh Management maintains certain corporate records of the Debtors, assists in the preparation of the Debtors' financial statements, provided the Debtors with one corporate director and provides certain similar services in exchange for an annual fee and additional monthly payments based upon the services provided during that period.

38.     The Debtors share common officers and directors. The names, business addresses and principal occupations of the Debtors' officers and directors are as follows:

| Name | Business Address | Principal activities outside the Debtors |
|------|------------------|------------------------------------------|
| John Perham, Director and Chief Executive Officer | 39 Templeogue Road, Terenure, Dublin 6W | Business Consultant |
| Peter Hughes, Director | 4th Floor, 25-28 Adelaide Road, Dublin 2 | Chartered Certified Accountant |
| Marsh Management Services (Dublin) Limited, Secretary | 4th Floor, 25-28 Adelaide Road, Dublin 2 | Independent Services Company |

39.     The sole employee of the Debtors is their Chief Executive Officer, Mr. John Perham, whom is employed pursuant to an "Employment Agreement" and also acts as a director of the Debtors.  Messrs. Perham, Hughes and Marsh Management have been paid monthly in advance for their services.

40.     Mr. Hughes resumed his position as a director of the Debtors in May, 2007, following an interim period in which an employee of Marsh Management, Mr. Brian McDonough, served as a director of the Debtors pursuant to the terms of the Corporate Services Agreements.  Mr. Hughes previously served as director pursuant to the Corporate Services Agreements with Marsh Management until termination of his employment with Marsh Management and resignation of his position as a director of the Debtors in approximately October, 2006.  Mr. Hughes has not been employed by Marsh Management since that date.  Mr. McDonough resigned his position as a director of the Debtors in May, 2007.  The Debtors

anticipate that Mr. Perham, Mr. Hughes and Marsh Management will continue to act in their respective capacities and be paid in the ordinary course of the Debtors' businesses following the Petition Date. However, Marsh Management will not provide the Debtors with a director under the Corporate Services Agreements during these cases. The Debtors have not reached a decision regarding whether the Employment Agreement and the Corporate Services Agreements will be assumed or rejected pursuant to Section 365 of the Bankruptcy Code.

Overview of Operations

41. Subject to the supervision of the Directors, all of the Debtors' significant operations are performed by third-parties pursuant to agreements entered into contemporaneously with the initial acquisition of the Policies. These operations included the daily management of communications with third parties regarding the maintenance and servicing of the Policies; banking and related services regarding the amounts due and received with regard to the Policies and any proceeds thereof, including the payment of Premiums and the distribution of any proceeds received upon maturation of the Policies; analysis and advice regarding the Debtors' investments in and management of the Policies, including their value and marketability, the identification of potential purchasers and the conduct of any sale of the Policies; and analysis and advice regarding allocation to and placement of the assets of the Debtors with third-parties for cash management and other services.

42. The third-parties that the Debtors contracted with to perform these services are largely identical. Further, the investors in the Debtors are identical except that Ritchie I has a term financing arrangement with a senior lender while Ritchie II was financed solely through the issuance of securities to private investors.

43.    A diagram depicting the operational roles of these third parties appears below:





Summary of Key Operating Relationships

44.    Seller.  LST is a limited liability company organized under the laws of the state of Delaware.  LST, as "Seller," sold the Policies to the Debtors.  Upon information and belief, Seller acquired certain of the Policies from or in connection with its affiliate Coventry.

45.    Servicer.  Coventry (sometimes referred to as "Servicer") is a limited liability company organized under the laws of the state of Delaware with an address at Coventry Corporate Center, 7111 Valley Road, Fort Washington, PA 19034, Telephone (215) 233-5100, Facsimile: (215) 402-8305.  Coventry, as Servicer, currently manages the Policies and performs all related communications, records and other activities with regard to the Insureds and each of the insurance companies that issued the Policies.  In its role as Servicer, Coventry maintains possession of the Policies and related operational records.

46.    Senior Lender.  ABN is a banking corporation organized under the laws of The Netherlands.  ABN, as "Prepetition Senior Lender" to Ritchie I but not Ritchie II, provides a senior term loan and liquidity facility to assist with the funding of and related maintenance expenses for the Policies.  Ritchie II does not have a "senior lender" and instead obtained funding to purchase the Policies from the holders of the Securities.  Ritchie I's obligations to the Senior Lender are secured by the Policies.

## IV.    Summary of Capitalization, Indebtedness and Securities

### A.    *Capitalization*

47.    The authorized share capital of the Debtors is €100,000,000 divided into 100,000,000 ordinary shares of €1.00 each.

48.    Two shares in each of the Debtors have been issued.  One share is registered in the name of Matsack Nominees Limited, and one share is registered in the name of Matsack Trust Limited.  Each of Matsack Nominees Limited and Matsack Trust Limited holds its respective share in the Issuer in trust for Brabazon Trust, an Irish charitable trust and the beneficial owner of the shares in the Debtors.

49.     As of the Petition Date, Ritchie I's capitalization consisted of the Senior Term Loan and Liquidity Facility and the Securities, each of which are further described herein. As to Ritchie II, its additional capitalization consisted of the Securities.

**B.**     ***Indebtedness***

50.     On January 29, 2007, Ritchie I entered into a Second Amendment to Senior Term Loan and Liquidity Agreement under which it may borrow up to $360,000,000 in Term Loan Advances and up to $52,000,000 in Liquidity Advances (collectively, the "Senior Debt") pursuant the terms of the Senior Term Loan and Liquidity Agreement dated as of October 21, 2005, as amended on January 29, 2007 (the "Senior Loan Agreement"). As of the date of the Petition Date, the Debtors have borrowed $350,601,177 in Term Loan Advance and approximately $52,000,000 in Liquidity Advances. The Senior Note has a stated maturity date of October 21, 2008. The Policies secure the Senior Debt.

51.     The Debtors may have nominal additional creditors related to the monthly operational expenses for administration and management of the Policies. These expenses are paid on a monthly basis based upon amounts available from the proceeds of the Policies upon maturation and any liquidity authorized by the Senior Lender. Further, the Debtors have received advances (the "Policy Advances") of a portion of the death benefits due upon maturation of certain of the Policies from various insurance companies. Upon information and belief, these insurance companies, however, are not creditors of the Debtors because the Debtors are not obligated to repay the Policy Advances in the event of termination of the Policies before maturation.

52.     Due to the limited nature of the Debtors' businesses and operations, there are no other significant known creditors other than the holders of the Securities, as described further herein. Although it is possible that the Insureds may attempt to assert claims against the Debtors

as a result of the complaint filed by the New York Attorney General, none have done so to date. Further, the Debtors are not in possession of the names and addresses of the Insureds because they are maintained by Coventry, the Servicer of the Policies. Accordingly, the number of known creditors is small in relation to the Debtors' assets.

**C.** *The Securities*

53.    Ritchie I.  The Securities issued by Ritchie I (the "Ritchie I Securities") consist of the Junior Notes and the Subordinated Securities.  As of the Petition Date, Ritchie I had issued Junior Notes with a principal value of $130,127,349.  The sole Holder of the Ritchie I Junior Notes is Ritchie I Life Strategies Master Trust.  Additionally, Ritchie I issued Subordinated Securities with a principal value of $27.0 million to Ritchie I Life Strategies Master Trust, $39.8 million to Ritchie I Risk-Linked Life Strategies Trust I and $20.2 million to Sandy Run, Ltd., an affiliate of Coventry.  Accordingly, as of the Petition Date, there were a total of three (3) holders of the Ritchie I Securities.

54.    Ritchie II.  The three holders of the Ritchie I Securities also hold Securities issued by Ritchie II (the "Ritchie II Securities").  Ritchie II issued Junior Notes with a principal value of $58,545,455 to Ritchie I Life Strategies Master Trust.   Additionally, Ritchie II issued Subordinated Securities with a principal value of $12.2 million to Ritchie I Life Strategies Master Trust, $17.8 million to Ritchie Risk-Linked Life Strategies Trust I and $9.1 million to Sandy Run, Ltd.

55.    The assets backing the issuance of the Securities are the Polices.  As of the date of the Petition Date, Ritchie I holds a total of 894 Policies with a net death benefit of approximately $2,289,955,773.  Ritchie II holds a total of 182 Policies with a net death benefit of approximately $419,506,854.   The Policies are a universal life, whole life or term policy (but each term policy is convertible into a universal or whole life policy), and may be a survivorship second-to-die

policy.  All the Policies were issued by insurance companies that are rated at least "A-" by Standard & Poor's or A3 by Moody's.

56.     The Securities constitute unsecured obligations of the Debtors and are payable in accordance with a Priority of Payments established in an Intercreditor Agreement. The Securities are not guaranteed by any party or secured by any collateral.  The Junior Notes rank *pari passu* and rateably without preference among themselves for all purposes.  The Subordinated Securities rank *pari passu* and rateably without preference among themselves for all purposes.

57.     Interest is payable on the Junior Notes on the 20th day of each calendar month ("Junior Note Interest Payment Date").  Each Junior Note bears interest at a fixed rate of 15% per annum of its Accreted Principal Amount on each interest determination date, subject to certain restrictions set forth in the Junior Notes.

58.     The Junior Notes mature on June 30, 2015 or any date prior to that date on which the Junior Notes become due and payable, as the case may be.  In addition the Junior Notes may be redeemed by the Debtors for cash, from time to time as a whole or in part, upon not less than 2 Business Days' written notice to the Holders, in either event at a redemption price equal to 100% of the Accreted Principal Amount (as defined in the Junior Notes), plus 10% of the Original Principal Amount (as defined in the Junior Notes) plus accrued and unpaid interest to, but excluding, the redemption date.

59.     Interest is payable on the Subordinated Securities on June 30 of each year (the "Subordinated Security Interest Payment Date" and together with the Junior Note Interest Payment Date, the "Interest Payment Date").  The Subordinated Securities interest amount ("Subordinated Interest Amount") shall be an amount equal to eighty (80%) of the Net Return

(as defined in the Subordinated Securities) as of such Interest Payment Date, subject to certain restrictions set forth in the Subordinated Securities.

60.     The Subordinated Securities also mature on June 30, 2015.

**Facts in Support of First Day Motion**

61.     Concurrently with the filing of their chapter 11 cases, the Debtors also filed a number of First Day Motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of their chapter 11 cases (the "First Day Hearing") at which the Court will hear and consider certain First Day Motions.  The Debtors also anticipate that the Court will consider the remainder of the First Day Motions at a later time.  Those First Day Motions that the Debtors anticipate will be heard at the First Day Hearing are described below.[1]

62.     Generally, the First Day Motions have been designed to meet the goals of (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of value to their assets; (b) maintaining the confidence and support of the Lender, certain creditors and other key constituencies; (c) obtaining necessary postpetition financing; and (d) establishing procedures for the smooth and efficient administration of these chapter 11 cases, including a sale of the Debtors' assets.  I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and ultimately will be critical to the Debtors' ability to implement its bankruptcy strategy.

63.     I also believe that it is critical that the First Day Motions be heard as soon as possible.  If the First Day Motions are not granted on an expedited basis, Ritchie I will not have access to cash and will be unable to fulfill its obligations by making premium payments and

---

[1]     Capitalized terms used below in the descriptions of the First Day Motions and not otherwise defined have the meanings given to them in the applicable First Day Motions.

maintain the value of their assets. Delays in the relief requested in the First Day Motions could negatively impact the Debtors' ownership and servicing of a significant portion of their assets, which consist of life insurance policy portfolios. The impact from any such delay, particularly if it affects the Debtors' life-insurance portfolios, would be immediate, widespread and irreparably harm the Debtors' estates and the successful prosecution of these cases.

64. The expedited approval of the First Day Motions is (a) critical to preservation of the estates' assets; and (b) in the best interests of all of the Debtors' creditors, all parties-in-interest, and the Debtors' estates.

### *The Case Administration Motion*

65. The Debtors seek authority to implement this administrative motion, which is designed to minimize the administrative burdens on the Debtors, the Court, and all parties in conducting these proceedings. I believe that the relief requested in this motion is important for the Debtors' smooth transition into chapter 11.

    a. <u>Joint Administration Motion</u>. The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their chapter 11 cases. Such an order is a necessary administrative convenience for the Court, the Office of the Clerk of the Court and all parties-in-interest. I believe that the joint administration of the Debtors' respective estates is warranted and will ease the administrative burden for the Court and the parties.

### *Professional Retention Applications*

66. The retention of certain chapter 11 professionals is essential to the Debtors' reorganization efforts. Accordingly, concurrently with, or shortly after, the filing of these chapter 11 cases, the Debtors will seek to retain various professionals, *nunc pro tunc* to the filing of these cases, to represent and assist them. These professionals include: (a) LeBoeuf, Lamb, Greene & MacRae LLP, as bankruptcy counsel; (b) Matheson Ormsby Prentice, as special

foreign counsel; (c) Fred C. Caruso of Development Specialists, Inc., as Chief Restructuring Officer and Development Specialists, Inc.; and (d) Houlihan Lokey Howard & Zukin, as investment bankers.

  a.  <u>Application to Retain LeBoeuf, Lamb, Greene & MacRae LLP, as Counsel for the Debtors</u>.  The Debtors have selected LeBoeuf, Lamb, Greene & MacRae LLP ("LLGM") as their bankruptcy counsel and general corporate counsel because LLGM has substantial experience and expertise in chapter 11 cases involving financial and investment companies as well as in the practice areas of corporate law, finance, life insurance, and litigation and other fields that may be required by the Debtors in these cases.  LLGM has the resources necessary to manage these chapter 11 cases.  LLGM has represented numerous debtors, creditors, purchasers, and other parties-in-interest before courts in the Second Circuit and in numerous other jurisdictions throughout the country.   Moreover, LLGM is extremely familiar with the Debtors' businesses, financial affairs, and the circumstances surrounding the Debtors' chapter 11 filings.  LLGM has represented the Debtors in connection with efforts relating to their out-of-court restructuring efforts and, recently, has advised the Debtors with respect to these chapter 11 cases and assisted the Debtors in the preparation for their commencement.

  b.  <u>Motion to Retain Fred C. Caruso of Development Specialists, Inc. as the Debtors' Chief Restructuring Officer and Development Specialists, Inc.</u>  The Debtors seek to retain Fred C. Caruso of Development Specialists, Inc. ("DSI") as their chief restructuring officer and DSI.  DSI and Mr. Caruso have extensive experience in restructuring and bankruptcy engagements, including the financial and reporting aspects of chapter 11 cases.  The Debtors base these requests upon the familiarity of DSI and Mr. Caruso with the Debtors' assets, liabilities and operations, and Mr. Caruso's involvement in strategic planning and implementation of the Debtors' financial goals.  Prior to the Petition Date, since approximately November, 2006, DSI and Mr. Caruso have been providing restructuring and turnaround advisory services to the Debtors, including advising on the potential sale of all or substantially all of the Debtors' assets.  Since that time, DSI and Mr. Caruso have developed substantial institutional knowledge regarding the Debtors' operations, finance, and systems and will be integral to the successful prosecution of these cases.

  c.  <u>Application to Retain Matheson Ormsby Prentice, as Special Foreign Counsel</u>.  The Debtors are Irish companies.   Matheson Ormsby Prentice ("Matheson Ormsby") is an Irish law firm based in Dublin, Ireland.  Matheson Ormsby has previously advised the Debtors on all Irish law matters and would continue to do so going forward, including representing the Debtors in any potential insolvency proceeding in Ireland. Matheson Ormsby has extensive knowledge regarding the Debtors' corporate structure, including international tax implications of any

transactions implemented in the bankruptcy cases, and will advise the Debtors on Irish law implications during these bankruptcy cases.

d.   <u>Application to Retain Houlihan Lokey Howard & Zukin, as Investment Bankers</u>. The Debtors seek to retain Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as investment bankers because of Houlihan Lokey's experience in the field of investment banking and because of Houlihan Lokey's experience in providing investment banking advice and support in connection with chapter 11 reorganization cases. Houlihan Lokey will be integral in the valuation, marketing, and sale of all or substantially all of the Debtors' assets in the bankruptcy case.

### *Debtor-in-Possession Financing/Cash Collateral*

e.   <u>DIP Financing/Cash Collateral Motion</u>. In order for Ritchie I to continue operating its business in the ordinary course and to preserve estate assets, it is essential that it obtain immediate postpetition financing and authority to use cash collateral. Ritchie I's survival as a going concern is dependent upon immediate liquidity to ensure that it is able to make pending premium and servicing payments in relation to the Policies. Failure to obtain liquidity will erode the value of Ritchie I's assets, impair the operation of its business, and harm the marketing efforts currently underway to sell all or substantially all of its assets. Additionally, because Ritchie I lacks sufficient funds necessary to meet certain imminent expenses, it is essential that Ritchie I obtain interim financing before the Court conducts a final hearing on any postpetition financing.

Ritchie I was unable to procure financing without the grant of liens on assets. Accordingly, Ritchie sought proposals for postpetition financing from ABN.

Ritchie I has filed a motion requesting authority for Ritchie I to incur postpetition senior secured financing (the "DIP Financing") in an amount up to $30,000,000 and to use cash collateral of the prepetition senior lender. The proceeds from the DIP Financing and the cash collateral will be used to make premium payments, pay Policy servicing fees and pay other operating expenses, including any payments required under the debtor-in-possession financing documents. The DIP Financing will be secured by a first priority, senior priming perfected lien in all property of Ritchie that is subject to a lien or security interest on the Petition Date (the "DIP Collateral"), including collateral of the prepetition senior lender securing obligations under the prepetition loan agreement (the "Prepetition Collateral"). In connection with the approval of the use of cash collateral and the DIP Financing, Ritchie I is also seeking authorization to grant adequate protection to the prepetition senior lender in respect of its interests in Prepetition Collateral. As adequate protection to the pre-petition senior lender for any diminution in the value of its interests in the Prepetition Collateral, the prepetition senior lender shall be granted replacement liens on, and security interests in, the DIP Collateral, subject to the Carve-Out, as defined in the DIP Credit Agreement, to secure it against any diminution in the value of the Pre-petition Collateral.

Ritchie I could not have obtained a postpetition financing facility without offering terms substantially similar to those of the DIP Financing. Prior to the Petition Date, Ritchie I evaluated its strategic alternatives with respect to refinancing its existing debt, as well as other restructuring alternatives. Ritchie was unable to find a lender willing to provide postpetition financing on an unsecured basis or on any more favorable terms than those of the DIP Financing. Moreover, the cost of the DIP Financing is comparable to the pricing of similar DIP financing transactions in the current market.

Ritchie I and ABN engaged in good faith and extensive arm's length negotiations. The terms and conditions of the proposed postpetition financing facility are set forth in that certain Debtor-in-Possession Credit Agreement among Ritchie I, as Borrower, and ABN, as the DIP Lender, as well as the Interim Order (I) Authorizing Secured Postpetition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 105, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) filed with the Court as of the date hereof.

Ritchie I requires the DIP Financing to make premium payments, pay Policy servicing fees and pay other operating expenses, including any payments required under the DIP loan documents. Without immediate access to the liquidity and working capital provided through the DIP Financing, Ritchie I's business operations will be severely disrupted and its going concern value jeopardized, to the detriment of its creditors. Without immediate access to postpetition financing, and authority to use the cash collateral, Ritchie I will suffer substantial and irreparable harm, which will threaten its ability to reorganize successfully. Ritchie I's need for access to the DIP Financing and use of the cash collateral, therefore, is urgent.

### *Other Substantive Motions*

f.  <u>Motion to Retain Professionals in the Ordinary Course of Business</u>. In the ordinary course of their business, the Debtors have retained certain professionals from time to time to provide services relating to the Debtors' operations and management of their assets and investments. For example, in April 2007, the Debtors retained RSM Robson Rhodes LLP to provide general auditing services for the Debtors' financial statements. The Debtors seek Court authority to continue to use such professional in the ordinary course of their business without having to incur additional administrative costs in filing a retention application for such professional or being forced to file monthly fee statements or quarterly fee applications for such ordinary course professional. As provided in the motion, the ordinary course professional being retained shall submit an affidavit regarding, among other things, the nature of its services and compensation information. The trustee and certain parties-in-interest shall have an opportunity to review such affidavits and object to the retention of such professional.

g.  <u>Motion Seeking Authority to Preserve Existing Bank Accounts</u>.  The Debtors' primary business consists of their investments in the Policies.  The Policies were purchased through a combination of (a) the procurement of senior secured debt from ABN. in the approximate aggregate amount of $412 million (the "Senior Debt"); (b) the issuance of Junior Notes in the approximate aggregate principal amount of $188 million; and (c) the issuance of Subordinated Securities in the approximate aggregate principal amount of $126 million.  The principal and interest balance and any other outstanding amounts due and owing on each of the Senior Debt, the Junior Notes and Subordinated Securities (collectively, the "Debt Obligations") is paid, in turn, through death benefits received under the Policies or proceeds from the sale of the same.

Prior to the commencement of these cases, in the ordinary course of business, the Debtors maintained a cash management system consisting of six bank accounts.  The Debtors each maintain three bank accounts by which the Debtors are able to effectively manage their cash receipts and disbursements (collectively, the "Bank Accounts").  The Bank Accounts include two draw accounts ("Draw Accounts"), two servicing accounts ("Servicing Accounts"), and two general accounts ("General Accounts").  Each Debtor maintains its own Draw Account, Servicing Account, and General Account.  There are no intercompany transfers between the Debtors' Bank Accounts.

Draw Account #790140001 (the "Ritchie I Draw Account") is held by Ritchie I at U.S. Bank, N.A. and was originally funded through loan amounts obtained by Ritchie I from the issuance of the Debt Obligations in order to fund the purchase of Policies from LST.  The Ritchie I Draw Account is currently used to channel death benefits, upon accrual, from insurance companies that issued the Policies to ABN, as the Paying Agent, which then distributes those funds pursuant to a waterfall as agreed to prepetition by certain parties, including the holders of the Debt Obligations.  Draw Account #792302001 (the "Ritchie II Draw Account") is held by Ritchie II at U.S. Bank, N.A. and is similarly funded through loan proceeds obtained by Ritchie II from the issuance of Junior Notes and the Subordinated Securities.  The Ritchie II Draw Account was similarly established to fund the purchase of Policies from LST.  The Ritchie II Draw Account has seen little to no activity recently and has *de minimus* amounts, if any, remaining.

Service Account #790140002 (the "Ritchie I Servicing Account") is held by Ritchie I at U.S. Bank, N.A. and has been funded, from time to time, by proceeds of the loan made by ABN, the holders of Junior Notes, and the holders of Subordinated Securities.  The Ritchie I Servicing Account is used to fund Ritchie I's Policy premiums and any amounts due on any Policy advances and to pay any servicing fees relating to the Policies.  In addition, funds are transferred from time to time, as needed, from the Ritchie I Servicing Account to the Ritchie General Account, as described below.  Service Account #792302002 (the "Ritchie II Servicing Account") is held by Ritchie II at U.S. Bank, N.A. and is funded from loan proceeds from the issuance by Ritchie II of Junior Notes and Subordinated Securities.  The Ritchie II Servicing Account is used to fund Ritchie II's Policy premiums and any amounts due

on any Policy advances and to pay any servicing fees relating to the Policies. In addition, funds are transferred from time to time, as needed, from the Ritchie II Servicing Account to the Ritchie II General Account, as described below.

General Account #61380281 (the "Ritchie I General Account") is held by Ritchie I at Allied Irish Bank and is funded, from time to time, as needed, by the Ritchie I Servicing Account. The Ritchie I General Account is used to fund the general operating expenses of Ritchie. General Account #61400063 (the "Ritchie II General Account") is held by Ritchie II at Allied Irish Bank and is funded by the Ritchie II Servicing Account. The Ritchie II General Account is used to fund the general operating expenses of Ritchie II. General operating expenses of the Debtors paid by their respective General Accounts include, without limitation, rents, salary and other expenses of officers, stock exchange listing fees, and accountant and administration fees.

The requested relief is appropriate because, given the complexity of the Debtors' business operations, a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of the Debtors' respective values as going concerns, simply cannot be achieved if the Debtors' cash management procedures are substantially disrupted and the Bank Accounts are closed. For example, the Debtors currently pay premiums and loan payments on over 1000 Policies as they accrue from time to time and on a rolling basis in any given month. Any disruptions to those payments could result in the canceling of Policies and jeopardize the value of the Debtors' estates. Therefore, it is essential that the Debtors be permitted to continue their existing Bank Accounts and continue the operation of their businesses pursuant to their existing cash management procedures.

The cash management system, with only slight variations made over time in the ordinary course of business, has been utilized by the Debtors since their inception and constitutes a customary and essential business practice. The use of such a system is attributable to the numerous benefits it provides, including the ability to (a) control and monitor funds, (b) invest idle cash, (c) ensure cash availability for daily and periodic expenses, and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.

It would be difficult, unduly burdensome and potentially devastating to the Debtors' estates to establish an entirely new system of Bank Accounts and a new cash management and disbursement system. Moreover, because the Debtors have the capability to draw the necessary distinctions between pre and postpetition obligations and payments without closing the prepetition Bank Accounts and opening new ones, the Debtors' creditors will not be prejudiced.

Preserving "business as usual" and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the system of existing Bank Accounts will facilitate the Debtors' stabilization of their postpetition business operations and will assist the Debtors in their reorganization efforts. Thus,

under the circumstances, the maintenance of the Bank Accounts not only is essential, but also is in the best interests of the Debtors' respective estates.

In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein. Because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession because of the large and publicized nature of these chapter 11 cases, changing business forms is unnecessary and unduly burdensome.

h.    <u>Motion Seeking Authority to Pay Insurance Premiums, Advances and Other Fee and Costs Owing under the Policies.</u>  As set forth above, the Policies are significant assets of the Debtors that require monthly payment of premiums. In addition, the Debtors are required to make monthly interest payments on pre-petition advances made under certain of the Policies as well as pay certain servicing fees related to the Policies (collectively, the "Policy Obligations"). As of the Petition Date, the Debtors seek authority for Ritchie I to pay approximately $4,000,000 in outstanding Policy Obligations related to the month of June, 2007 and to continue to pay Policy Obligations thereafter. Failure to pay the Policy Obligations in a timely manner may cause the decline in value of the Policies for sale and affect their servicing. Any detrimental effect to the Policies would jeopardize significant assets of these estates and imperil the Debtors' efforts to achieve their goals in these cases.

## **Information Required by Local Bankruptcy Rule 1007-2**

67.    Local Bankruptcy Rule 1007-2 requires that certain information about the Debtors be provided in this Affidavit. This required information is provided below and in the attached schedules. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis for all of the Debtors.

68.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedules 1(A)-(B) attached hereto lists the following information – to the extent available – with respect to each of the holders of each of the Debtors' 20 largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address); telephone number; the name(s) of person(s) familiar with

the Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

69.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedules 2(A)-(B) attached hereto provides the following information – to the extent available – with respect to each of the holders of the five largest secured claims against each of the Debtors: the creditor's name and address (including the number, street, apartment or suite number and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

70.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedules 3(A)-(B) attached hereto provide a summary of each of the Debtors' assets and liabilities.

71.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedules 4(A)-(B) attached hereto provide a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity and the court in which any proceeding relating thereto is pending.

72.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedules 5(A)-(B) attached hereto provide a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

73.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedules 6(A)-(B) attached hereto provide the location of the Debtors' substantial assets; the location of their books and records and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

74.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 7 attached hereto provides a list of the nature of present actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property is imminent.

75.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedules 8(A)-(B) attached hereto provide a list of the name of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

76.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), Schedule 9 hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

77.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedules 10(A)-(B) attached hereto provide, for the 30-day period following the Petition Date, a list of estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.


[Remainder of page left intentionally blank]

I respectfully request that all of the relief requested in the First Day Motions be granted along with such other and further relief as is just.

**Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.**
**Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.**

By: /s/ Fred C. Caruso
Name: Fred C. Caruso
Title: Chief Restructuring Officer

Sworn to and subscribed before me, a notary public for the State of Illinois, County of Cook, this 19th day of June, 2007.

/s/ Sandra Cerda
Notary Public

**<u>Schedule 1(A)</u>**

***Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.***

**<u>20 Largest Unsecured Claims</u>**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.'s twenty (20) largest unsecured claims, including claims of insiders as defined in section 101(31) of the Bankruptcy Code. The list has been prepared from the books and records of the Debtor. The list is prepared in accordance with Bankruptcy Rule 1007(d). Given the limited number of creditors, the list below includes claims of insiders, each as denoted with an asterix. The list does not include secured creditors, unless the value of the collateral is less than the total amount of such creditor's claim and the unsecured deficiency places the creditor among the holders of the largest unsecured claims. This list also does not include claims held by any of the Debtor's employees, officers or directors.

The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors. The list below reflects information existing as of May 31, 2007. The Debtors reserve their right to object to claims or assert that they are contingent, unliquidated, and/or disputed. The Debtors reserve the right to amend or supplement the list based on information existing as of the filing date. Finally, the information provided below may be inconsistent with that provided on the Debtors' Schedules and Statements of Financial Affairs and should not be relied upon for purposes of filing claims against the estates.

| (1)<br><br>Name of Creditor | (2)<br><br>Name, facsimile number and mailing address of contact regarding creditor claim | (3)<br><br>Nature of claim (trade debt, loan, contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed or subject to setoff | (5)<br><br>Amount of claim |
|---|---|---|---|---|
| Ritchie Life Strategies Master Trust** | c/o Walkers SPV Ltd. Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Junior Notes | Contingent | $130,127,349 (principal amount)<br><br>$37,211,048 (interest) |
| Ritchie Risk-Linked Life Strategies Trust I** | c/o Walkers SPV Limited Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Subordinated Securities | Contingent, Unliquidated | $39,779,582 |

| | | | | |
|---|---|---|---|---|
| Ritchie Life Strategies Master Trust** | c/o Walkers SPV Limited Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Subordinated Securities | Contingent, Unliquidated | $26,969,208 |
| Sandy Run Ltd.** | Coventry First LLC Coventry Corporate Center 7111 Valley Green Road Fort Washington, PA 90341 Tel: 215-233-5100 Fax: 215-233-3201 | Subordinated Securities | Contingent, Unliquidated | $20,227,452 |
| Montgomery Ltd. | c/o Appleby Corporate Services Canon's Court 22 Victoria Street P.O. Box HM 1179 Hamilton HM CX Bermuda Tel: 441-298-3276 Fax: 441-298-3355 | Bermuda Servicer and Administration Fee | Contingent, Unliquidated | $8,261,161 |

**_Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd._**

**20 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.'s twenty (20) largest unsecured claims, including claims of insiders as defined in section 101(31) of the Bankruptcy Code. The list has been prepared from the books and records of the Debtor. The list is prepared in accordance with Bankruptcy Rule 1007(d). Given the limited number of creditors, the list below includes claims of insiders, each as denoted with an asterix. The list does not include secured creditors, unless the value of the collateral is less than the total amount of such creditor's claim and the unsecured deficiency places the creditor among the holders of the largest unsecured claims. This list also does not include claims held by any of the Debtor's employees, officers or directors.

The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors. The list below reflects information existing as of May 31, 2007. The Debtors reserve their right to object to claims or assert that they are contingent, unliquidated, and/or disputed. The Debtors reserve the right to amend or supplement the list based on information existing as of the filing date. Finally, the information provided below may be inconsistent with that provided on the Debtors' Schedules and Statements of Financial Affairs and should not be relied upon for purposes of filing claims against the estates.

| (1) Name of Creditor | (2) Name, facsimile number and mailing address of contact regarding creditor claim | (3) Nature of claim (trade debt, loan, contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed or subject to setoff | (5) Amount of claim |
|---|---|---|---|---|
| Ritchie Life Strategies Master Trust** | c/o Walkers SPV Limited Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Junior Notes | Contingent | $58,545,454 (principal amount) $8,475,851 (interest) |
| Ritchie Risk-Linked Life Strategies Trust I** | c/o Walkers SPV Limited Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Subordinated Securities | Contingent, Unliquidated | $17,897,369 |

| | | | | |
|---|---|---|---|---|
| Ritchie Life Strategies Master Trust** | c/o Walkers SPV Limited Walker House, P.O. Box 908GT Mary Street, George Town Grand Cayman, Cayman Islands Tel: 345-949-0100 Fax: 345-814-8259 | Subordinated Securities | Contingent, Unliquidated | $12,133,809 |
| Sandy Run Ltd.** | Coventry First LLC Coventry Corporate Center 7111 Valley Green Road Fort Washington, PA  90341 Tel:  215-233-5100 Fax:  215-233-3201 | Subordinated Securities | Contingent, Unliquidated | $9,100,289 |
| Montgomery Ltd. | c/o Appleby Corporate Services Canon's Court 22 Victoria Street P.O. Box HM 1179 Hamilton HM CX Bermuda Tel:  441-298-3276 Fax:  441-298-3355 | Bermuda Servicer and Administration Fee | Contingent, Unliquidated | $1,997,749 |

## Schedule 2(A)

### *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*

### 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.'s five largest secured claims on a consolidated basis, with information current as of May 31, 2007.

The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors. The list below reflects information existing as of May 31, 2007. The Debtors reserve their right to object to claims or assert that they are contingent, unliquidated, and/or disputed. The Debtors reserve the right to amend or supplement the list based on information existing as of the filing date. Finally, the information provided below may be inconsistent with that provided on the Debtors' Schedules and Statements of Financial Affairs and should not be relied upon for purposes of filing claims against the estates.

| *(1)* <br><br> *Name of Creditor* | *(2)* <br><br> *Name, facsimile number and mailing address of contact regarding creditor claim* | *(3)* <br><br> *Description of claim* | *(4)* <br><br> *Estimated Collateral Value* | *(5)* <br><br> *Amount of claim* |
|---|---|---|---|---|
| ABN AMRO Bank N.V (Chicago Branch) | 540 West Madison Street, 26th Fl Chicago, IL 60661-2591 Attention: Credit Administration Tel: 312-992-0430 Fax: 312-992-5111 | Senior Loan and Accrued Interest | Fully secured | $350,601,177 (principal) <br><br> $36,661,455 (senior loan interest) |
| ABN AMRO Bank N.V. (Chicago Branch) | 540 West Madison Street, 26th Fl Chicago, IL 60661-2591 Attention: Credit Administration Tel: 312-992-0430 Fax: 312-992-5111 | Liquidity Facility Loan and Accrued Interest | Fully secured | $50,700,000 (principal amount) <br><br> $2,600,363.91 (liquidity facility interest) |

## Schedule 2(B)

### *Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

### 5 Largest Secured Claims

Based on information existing as of May 31, 2007, Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. has no secured claims.

The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors. The Debtors reserve the right to amend or supplement the information provided herein. Finally, the information provided below may be inconsistent with that provided on the Debtors' Schedules and Statements of Financial Affairs and should not be relied upon for purposes of filing claims against the estates.

<u>**Schedule 3A**</u>

***Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.***

<u>**Summary of Assets and Liabilities (Unaudited)**</u>

**Total Assets:**      <u>**Undetermined**</u>

**Total Liabilities:**   <u>**$703,140,034**</u>

<u>**Schedule 3B**</u>

***Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.***

<u>**Summary of Assets and Liabilities (Unaudited)**</u>

**Total Assets:**      <u>**Undetermined**</u>

**Total Liabilities:**   <u>**$108,156,921**</u>

<strong><u>Schedule 4(A)</u></strong>

<strong><em>Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.</em></strong>

<strong><u>Debtors' Property not in Debtors' Possession</u></strong>

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists Ritchie Risk-Linked Strategies Trading (Ireland), Ltd's property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor or agent for any such entity, and the court, if any, in which any proceeding relating thereto is pending.

| Property | Entity Holding Property | Court Proceeding |
|---|---|---|
| Life Insurance Policies and related information | U.S. Bank NA<br>60 Livingston Ave, EP MN WS3D<br>St. Paul, MN 55107-2292<br>Attn: Life Settlements Mgr<br>Tel:  800-872-2657<br>Fax:  651-495-8093 | N/A |
| Life Insurance Policies and related information | Coventry First LLC<br>Coventry Corporate Center<br>7111 Valley Green Road<br>Fort Washington, PA 19034<br>Tel: 215-233-5100<br>Fax: 215-402-8305 | N/A |

## Schedule 4(B)

### *Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

### Debtors' Property not in Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd's property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor or agent for any such entity, and the court, if any, in which any proceeding relating thereto is pending.

| Property | Entity Holding Property | Court Proceeding |
|---|---|---|
| Life Insurance Policies | U.S. Bank NA<br>60 Livingston Ave, EP MN WS3D<br>St. Paul, MN 55107-2292<br>Attn: Life Settlements Manager<br>Tel:   800-872-2657<br>Fax:  651-495-8093 | N/A |
| Life Insurance Policies and related information | Coventry First LLC<br>Coventry Corporate Center<br>7111 Valley Green Road<br>Fort Washington, PA 19034<br>Tel: 215-233-5100<br>Fax: 215-402-8305 | N/A |

<u>**Schedule 5(A)**</u>

***Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.***

<u>**Debtors' Property**</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists Ritchie Risk-Linked Strategies Trading (Ireland), Ltd's property or premises owned, leased or held under other arrangement from which the Debtor operates its business:

| Property | Owned/Leased |
| --- | --- |
| Regus House, Suite 207<br>Attn: Ruth Flynn<br>Harcourt Centre<br>Harcourt Road<br>Dublin 2, Ireland<br>Tel: 353-1-402-9400<br>Fax: 353-1-402-9587 | Leased |

## Schedule 5(B)

### *Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

### Debtors' Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. does not own or lease any property or premises.

<u>**Schedule 6(A)**</u>

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*

<u>**Location of Debtors' Assets and Books and Records**</u>
**&**
<u>**Nature, Location and Value of Assets Held Outside of United States**</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.'s substantial assets, the location of their business records and the nature, location and value of any assets held by the Debtors outside of the territorial limits of the United States.

| Location of Assets in the United States | Type of Property Held |
| --- | --- |
| U.S. Bank NA<br>60 Livingston Ave,<br>EP MN WS3D<br>St. Paul, MN 55107-2292<br>Attn: Life Settlements Manager | Life Settlement Policies and related information and documents |
| Coventry First LLC<br>Coventry Corporate Center<br>7111 Valley Green Road<br>Fort Washington, PA 19034 | Life Settlement Policies and related information and documents |
| New York, New York | Contractual right to payments based upon the Transaction Documents |

| Location of Business Records |
| --- |
| Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.<br>c/o Marsh Management Services (Dublin) Ltd.<br>Attn: Brian McDonagh or Brendan Roche<br>4th Floor, 25-28 Adelaide Road, 2<br>Dublin, Ireland |
| Ritchie Capital Management, LLC<br>801 Warrenville Road<br>Lisle, Illinois 60532 |

| Location and Value of Assets Outside the United States |
| --- |
| N/A |

## Schedule 6(B)

### *Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

### Location of Debtors' Assets and Books and Records
### &
### Nature, Location and Value of Assets Held Outside of United States

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.'s substantial assets, the location of their business records and the nature, location and value of any assets held by the Debtors outside of the territorial limits of the United States.

| Location of Assets in the United States | Type of Property Held |
|---|---|
| U.S. Bank NA<br>60 Livingston Ave,<br>EP MN WS3D<br>St. Paul, MN 55107-2292<br>Attn: Life Settlements Manager | Life Settlement Policies and related information and documents |
| Coventry First LLC<br>Coventry Corporate Center<br>7111 Valley Green Road<br>Fort Washington, PA 19034 | Life Settlement Policies and related information and documents |
| New York, New York | Contractual right to payments based upon the Transaction Documents |

| Location of Business Records |
|---|
| Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.<br>c/o Marsh Management Services (Dublin) Ltd.<br>Attn: Brian McDonagh or Brendan Roche<br>4th Floor, 25-28 Adelaide Road, 2<br>Dublin, Ireland |
| Ritchie Capital Management, LLC<br>801 Warrenville Road<br>Lisle, Illinois 60532 |

| Location and Value of Assets Outside the United States |
|---|
| N/A |

## Schedule 7

### *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*
### *Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

## Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief and understanding, there are no actions or proceedings pending or threatened against the Debtors or their properties, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.

<u>**Schedule 8(A)**</u>

***Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.***

<u>**Senior Management**</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the name of the individual who comprises Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.'s existing senior management, a description of his tenure with the Debtor and a brief summary of his relevant responsibilities and experience.

| Name | Title | Description of Duties and Experience |
|------|-------|--------------------------------------|
| John Perham | Chief Executive Officer, Director | Mr. Perham carries out duties on behalf of the Debtors as CEO to ensure smooth and lawful running within a framework of assisting and acknowledging the investors' business objectives. Mr. Perham has served in his capacity as CEO and the Irish-Resident Director of Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. from June 23, 2005 until present.<br><br>Mr. Perham is a chartered accountant, with a degree in business, and is a member of the Institute of Directors in Ireland. He has worked in the insurance industry since 1995 and has been involved in all aspects of day-to-day management, strategic planning and implementing programs. Various overseas assignments enable Mr. Perham to bring a truly international dimension and a local understanding to management of the Debtors. In addition, Mr. Perham is also a non-executive director of several Irish based insurance and reinsurance companies that are not related to the Debtors. |
| Peter Hughes | Director | Mr. Hughes is responsible for and carries out duties on behalf of the Debtors as Director, to ensure smooth and lawful running within a framework of assisting and acknowledging the investors' business objectives. Mr. Hughes has served as a director of Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. from June 26, 2005 to October 3, 2006 and from May 11, 2007 until present.<br><br>Mr. Hughes is a chartered certified accountant and, in addition, acts an independent Director of various companies established in Ireland. |

<u>**Schedule 8(B)**</u>

***Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.***

<u>**Senior Management**</u>

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the name of the individual who comprises Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.'s existing senior management, a description of his tenure with the Debtor and a brief summary of his relevant responsibilities and experience.

| Name | Title | Description of Duties and Experience |
|------|-------|--------------------------------------|
| John Perham | Chief Executive Officer, Director | *See* Description in Schedule 8(A). Mr. Perham has served in his capacity as CEO and the Irish Resident Director of Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. from November 29, 2005 until present. |
| Peter Hughes | Director | *See* Description in Schedule 8(A). Mr. Hughes has served in his capacity as a Director of Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. from November 23, 2005 until October 3, 2006 and from May 11, 2007 until present. |

## Schedule 9

### Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.
### Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.

### Payroll

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

| Entity | Estimated Weekly Payroll |
|---|---|
| Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. | $0.00 |
| Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. | $0.00 |

| Entity | Estimated Payments to Officers, Directors, and Stockholders |
|---|---|
| Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. | $126,973.00 |
| Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. | $26,847.00 |

| Entity | Estimated Payments to Consultants: Houlihan Lokey Howard & Zukin |
|---|---|
| Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. | $211,491.00 |
| Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. | $38,509.00 |

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*

**Projected Income Statement**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.'s chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Description | Estimated Disbursements |
| --- | --- |
| Coventry Servicing Fee | $191,000 |
| Policy Paying Agent Fee | $48,000 |
| Premium and Policy Loan Payments | $12,643,104 |
| Salary and Benefits | $126,973 |
| Rent payments to Regus House | $3,450.00 |
| Miscellaneous Office Expenses | $6,751 |
| Auditor fee for regulatory filing | $19,950 |
| **Total** | **$13,039,228** |

| Description | Estimated Receipts/Receivables |
| --- | --- |
| Maturity of life insurance policies | Unknown |
| Accrued Interest | $3,000.00 |
| **Total** | **$3,000.00** |

| Description | Estimated Gains | Estimated Losses |
| --- | --- | --- |
| N/A | N/A | N/A |

*Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.*

**Projected Income Statement**

      Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.'s chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss and obligations and receivable expected to accrue that remain unpaid, other than professional fees.

| Description | Estimated Disbursements |
|---|---|
| Coventry Servicing Fee | $34,959.00 |
| Policy Paying Agent Fee | $8,740.00 |
| Premium and Policy Loan Payments | $1,075,117.00 |
| Salary and Benefits | $26,847.00 |
| Miscellaneous Office Expenses | $1,229.00 |
| Auditor fee for regulatory filing | $19,950.00 |
| **Total** | **$1,166,842.00** |

| Description | Estimated Receipts/Receivables |
|---|---|
| Maturity of life insurance policies | Unknown |
| Accrued Interest | $10,000.00 |
| **Total** | **$10,000.00** |

| Description | Estimated Gain | Estimated Loss |
|---|---|---|
| N/A | N/A | N/A |